## BIG RUN COAL CO. v. MATTHEW ADDY CO.

(Circuit Court of Appeals, Sixth Circuit. July 17, 1923.)

No. 3818.

1. **Reformation of instruments ☞7—Equity will not aid enforcement of illegal contract.**

Equity will not aid the enforcement of an illegal contract, but will leave the parties thereto where it finds them, and therefore will not reform a contract for the sale of coal, so as to provide for the payment of the maximum price fixed by the government under Lever Act, § 25 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛q), where another contract entered into as part of the same transaction provided for an additional commission, which would render the contract illegal if reformed.

2. **Appeal and error ☞1009(4)—Conclusion of District Court in equity suit accepted, unless evidence decidedly preponderates against it.**

A conclusion by the District Court in an equity suit, after hearing the witnesses in open court, that the evidence was against plaintiff's contention will be accepted on appeal, unless the evidence decidedly preponderates against it.

3. **Reformation of instruments ☞45(15)—Evidence held to show plaintiff intended violation of law by contract sought to be reformed.**

In a suit for reformation of a contract for the sale of coal, so as to require the payment of the maximum government price, evidence held to show that plaintiff, by negotiating a separate contract for a commission in addition to the contract price, intended to violate the Lever Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛e et seq.) and the regulations thereunder by which the jobber's commission was to be included in the maximum price.

Appeal from the District Court of the United States for the Southern District of Ohio; John W. Peck, Judge.

Suit in equity to reform a contract by the Big Run Coal Company against the Matthew Addy Company. From a decree dismissing the bill, complainant appeals. Affirmed.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Allen C. Roudebush, of Cincinnati, Ohio, for appellant.

Calvin S. Cramer, of Cincinnati, Ohio (Nelson B. Cramer and Julius R. Samuels, both of Cincinnati, Ohio, on the brief), for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. Appellant (hereinafter called plaintiff) was the owner of a coal mine at Princess, Ky. It also held a contract for the output of the Kentucky Gem Coal Company, at $3 per ton, for the period of one year from and after August 15, 1917. As of May 31, 1918, plaintiff contracted for the sale to defendant of the former's entire output of coal from that date to March 31, 1919, inclusive, "at $2.75 per ton f. o. b. mines"; these words being followed by the express provision that "in the event there is any change in the government price, this contract is automatically canceled and a new contract in accordance with the new government regulations or prices will be entered into." Simultaneously with that agreement, plaintiff assigned to defendant the former's contract for the output of the Kentucky Gem mine. At that time the maximum government price applicable to the Princess mine coal was $3 per ton. On and after April 1, 1918 (and thus at the time of the transactions in question), the jobber's commission was required to be included as part of the maximum mine price. Simultaneously with the making of the contract of May 31, 1918, already mentioned, defendant delivered, and David S. Gay, president of the plaintiff company, accepted, the defendant's written agreement to pay Gay personally—

"7½ cents per ton on every ton of coal shipped for account of the Matthew Addy Company from this date to March 31, 1919, inclusive—this being a personal agreement between you and myself [defendant's vice president] with regard to the additional purchase price."

The contract seems to have been carried out until some time in November, 1918, at which time defendant refused to take any more coal. Until that time the contract price of $2.75 per ton for Princess mine coal was paid, as well as the 7½ cents per ton provided by the side contract, which was paid on all the coal received by defendant from both the Princess mine and the Kentucky Gem mine, as seems to have been the intention of the side agreement. In December, 1919, plaintiff demanded an additional 25 cents per ton on all coal theretofore shipped, because, as asserted, such was the government price and the price agreed to. This demand was denied, and plaintiff thereupon filed this bill for reformation of the principal contract of May 31, 1918, by substituting the maximum government price of $3 per ton, in place of the stated $2.75, for Princess mine coal, upon the ground that the contract called for the maximum government price, and that plaintiff was induced to execute it in the form it bore through the false representation of defendant that the maximum government price was $2.75. The side contract for 7½ cents per ton is not mentioned in the bill.

On hearing upon pleadings and proofs, the bill was dismissed, for the reasons that in the opinion of the court the side contract to pay an additional 7½ cents per ton was illegal, if in addition to the maxi-

mum government price for the Princess mine coal; that the side contract was inseparable from the principal contract, and thus tainted the entire agreement, and so left plaintiff without standing in a court of equity with respect to its application for reformation.

[1] The bill for reformation was properly dismissed, unless, as plaintiff contends, it acted in good faith and without any intention to violate the law by obtaining more than the maximum government price for its coal. By section 25 of the Lever Act (Act Aug. 10, 1917, 40 Stat. c. 53, p. 276; Comp. St. 1918, Comp. Stat. Ann. Supp. 1919, § 3115⅛q) the President of the United States was empowered "to fix the price of coal and coke, wherever and whenever sold, either by producer or dealer," and to establish rules for the regulation of the production, sale, etc. That section penalizes the violation of or refusal to conform to the regulations provided for in the section with knowledge that they had been so prescribed. Ford v. United States (C. C. A. 6) 281 Fed. 298. It is the well-settled rule that a court of equity will not lend its aid to the enforcement of an illegal contract, but will leave the parties thereto where it finds them, and this, not because of any tenderness for the party against whom relief is sought, but by way of enforcing a sound public policy. Continental Wall Paper Co. v. Voight, 212 U. S. 227, 29 Sup. Ct. 280, 53 L. Ed. 486.

As the case is presented here, plaintiff had, at the time this contract with defendant was made, the right to a commission on the Kentucky Gem coal (which it did not produce), and had violated no law by merely agreeing with defendant for a portion of the permissible commission as part of its compensation in the transaction. Nor did it violate the law merely by contracting for the sale of the Princess mine coal (produced by it) at $2.82½ per ton. It had, however, no right to a commission on the Princess mine coal above the maximum government price. The awkwardness of plaintiff's plight is that it insists that the main contract, as executed and delivered, was intended to carry the maximum government price for the Princess mine coal, and its bill is filed upon that theory, while it at least prima facie appears that plaintiff intended by the contract it made to receive more than the maximum government price for coal produced by it. This being so, it is not of controlling importance that plaintiff may have been induced to sign the contract through misrepresentation on the part of defendant, because plaintiff is now asking the court so to reform the contract as to substitute therein the maximum government price in place of that which plaintiff then supposed to be such maximum.

As bearing upon plaintiff's intention: In the original draft of the main contract, as presented by defendant's representative, the price was given as "$2.75 per net ton f. o. b. mines." Plaintiff suggested the addition of the following words:

"The present government price, or the prevailing government price, if any changes."

This change was accepted by defendant and the contract was executed accordingly. Simultaneously with the making of this contract, the side contract before referred to was made. A few days later the contract in its present form, as first set forth herein, was substituted

for the original form on account of a suggestion by defendant that it feared the contract as executed "would not hold water."

Plaintiff's claim of good-faith mistake, and freedom from intent to violate the law in making the side contract, rests largely upon the proposition, in substance, that defendant was merely to take the place of one Paynter, who had lately theretofore been under contract with plaintiff to sell the product of both the Princess and the Kentucky Gem mines, paying plaintiff $2.75 for the Princess coal, and dividing with Gay the commission on both the Princess and Kentucky Gem coal, whereby Gay claimed he was in effect merely getting the entire commission of 15 cents per ton on the Kentucky Gem coal, and that the form of the Paynter agreement was, by mistake and inadvertence, applied to the transaction with defendant. Plaintiff claims to have also understood, when dealing with Paynter, that $2.75 was the maximum government price for the Princess mine coal, that he was assured by Paynter that the transaction was lawful.

[2, 3] The District Court, after hearing the witnesses in open court, held that the evidence was overwhelmingly against plaintiff's contention. We accept that conclusion unless the evidence decidedly preponderates against it. Pugh v. Snodgrass (C. C. A. 6) 209 Fed. 325, 126 C. C. A. 251. It would be enough to say that in our opinion the evidence does not preponderate against the District Court's conclusion. As the District Judge points out, the side contract for 7½ cents per ton was made "with circumstances of both deliberation and concealment," the added price being omitted from the main contract and embodied in a separate document; that as the Kentucky Gem contract ended August 15, 1918, Gay's continuance to accept the commission of 7½ cents per ton on the Princess mine coal negatived his claimed intent to receive only a 15 cents commission on the Kentucky Gem coal, as evidenced by the fact that the latter commission (until August 15th) would have amounted to but $1,500, instead of $3,750, as under the agreement made. As also pointed out by the District Judge, plaintiff can gain nothing from the fact that the side contract was made with Gay personally, as the latter was the owner of the entire capital stock of the plaintiff corporation, and the result was thus the same, whether the money went directly to the latter or to Gay personally. We must accept the conclusion, reached by the court below, that the purpose of the side contract was to enable Gay to get an additional 7½ cents per ton on the Princess mine coal above the government price. We also agree with the court below that the side contract was inseparable from the main contract.

We see no escape from the conclusion that the decree below was right, and should be affirmed.