## BOWEN v. B. F. GOODRICH CO.

Circuit Court of Appeals, Sixth Circuit.
December 6, 1929.

No. 5251.

W. L. Day, of Cleveland, Ohio (Day & Day, of Cleveland, Ohio, and Sheck, Stevens & Hargreaves and F. E. Shannon, all of Akron, Ohio, on the brief), for appellant.

C. M. Horn, of Cleveland, Ohio (Dustin, McKeehan, Merrick, Arter & Stewart, H. H. McKeehan, and C. M. Horn, all of Cleveland, Ohio, on the brief), for appellee.

Before MOORMAN, HICKS, and KNAPPEN, Circuit Judges.

MOORMAN, Circuit Judge. Appellant was employed by appellee as a rubber calendar operator from 1915 to 1924. In 1916 the appellee established a system "of suggestions and awards" whereby it invited its employees to submit suggestions pertaining to improvements in methods of production. These suggestions were received by a committee which made small awards for those that were approved. In May of 1921 appellant submitted the suggestion set out in the margin.[1] He had previously submitted other suggestions and received awards. Acting upon the one in question, appellee's experimental engineer, without any assistance or further suggestion from appellant, devised and perfected a knife attachment which was put into use and resulted in a considerable saving in the cost of operating calendars. After the device had been tried out, appellant was given an award of $250. This was paid to

[1] "I would like to suggest that there be a knife installed to trim 597 fab. cord 36166 coat on front side of calender. By doing this it would eliminate the selvedge which is now about seventy-five pounds daily from one machine. It can be trimmed from the front side just as easy and do a much neater job and would save four cords on each roll of fabric. I explained this to Mr. Price a few days ago. He can explain it to you better than this will. This is worth your consideration."

him August 5, 1921. Drawings of the device were finally completed and an application for a patent thereon made in the name of appellant. Appellant signed the application December 21, 1921, and at the same time assigned the patent to the appellee. In December, 1923, two years after the assignment, it was found necessary to file a method application. This application the appellant refused to sign, claiming that he had not received adequate compensation for the original. About the same time he was given and received an additional award of $250. In November of 1926 he brought this suit to cancel and set aside the assignment of December, 1921, upon the ground of fraud on the part of appellee in obtaining its execution. He also asked for an accounting and damages for appellee's use of the device from that date. Upon the trial the lower court denied the relief and dismissed the bill.

We are not concerned with the obligations and rights arising from the custom of appellee's employees of assigning their inventions to it. The appellant's action was necessarily based upon the ground that he was not legally bound to make the assignment in question, and that the invention was his property. This is admitted by the appellee. The issue therefore is strictly one of fraud, and as narrowed in the pleadings and proofs is limited to the single inquiry: Was appellant induced to execute the assignment under the fraudulent representation that it was one of the papers which it was necessary for him to sign in order to secure the patent for himself? It is not claimed that there was any coercion, mistake of law, or lack of understanding of legal rights. Contrarily, the position of appellant is that he knew his rights but was induced to sign them away through fraudulent representations as to the contents of the paper.

There were but two witnesses to what occurred when the assignment was executed—the appellant and Eakin, an attorney for appellee. Their testimony is in sharp conflict. Appellant admitted signing the assignment, denied acknowledging it before a notary, and claimed that he did not read it because he was told by Eakin that it was not necessary, that all papers were properly made out, and the patent was to be obtained for him—the appellant. Eakin testified that it was the practice of employees submitting suggestions that were embodied in a patent application to assign the patent to the appellee; that he had prepared the patent papers, including the assignment, before the appellant came into his office; that he had never seen appellant before; that appellant read the papers but de-

curred at executing the assignment because, as he asserted, the employees had not been treated fairly during the slack times of 1921; that he did, however, sign it and acknowledge it before a notary public. The notary public, who was not present at this interview, identified his own signature, but had no recollection of having seen the appellant.

The issue is thus reduced to a question of veracity between appellant and the witness Eakin, as illuminated by the circumstances disclosed in the record. Before noticing these circumstances we observe that where a complainant seeks a rescission of an executed instrument upon the ground of fraud, he must establish the fraud by evidence that is clear and convincing. Atlantic Co. v. James, 94 U. S. 207, 24 L. Ed. 112; Maxwell Land-Grant Case, 121 U. S. 325, 7 S. Ct. 1015, 30 L. Ed. 949; Lalone v. United States, 164 U. S. 255, 17 S. Ct. 74, 41 L. Ed. 425. And, further, that upon an issue of fact involving the credibility of conflicting evidence given in open court, as in this case, the conclusions of the trial judge are entitled to great weight. In re Snodgrass, 209 F. 325 (6 C. C. A.); Big Run Coal Co. v. Matthew Addy Co., 290 F. 781 (6 C. C. A.); United States v. United Shoe Machinery Co., 247 U. S. 32, 38 S. Ct. 473, 62 L. Ed. 968. Other applicable principles are that while an entire want of consideration to support a contract or conveyance is ground for cancellation providing the rights of third parties have not intervened, inadequacy of consideration or improvidence is not of itself sufficient, though it may be so great as to furnish convincing evidence of fraud.

The appellant relies for confirmation of his evidence upon the consideration which he received and the situation in which he found himself. It is said that he was uneducated, an employee of the appellee, and that he received only $500 for a suggestion which led to the development of a device the use of which resulted in a saving to the appellee of something like $60,000 a year. These facts, definitely convincing as they would be if unexplained, and in any situation important, lose much of their significance in the light of their surrounding circumstances. Nothing appears to indicate that appellant was not capable of fully comprehending the meaning of the papers upon reading them. His claim is that he did not read them, and, being an employee, it is perhaps true that he was less inclined to do so than he would have been had he been dealing with some one else; but it is also true that his purpose in making the suggestion was to give the idea to the appellee to be used in its plant, and in any view the appellee had a shop right to the invention. Solomons v. United States, 137 U. S. 342, 11 S. Ct. 88, 34 L. Ed. 667; Lane & Bodley Co. v. Locke, 150 U. S. 193, 14 S. Ct. 78, 37 L. Ed. 1049; Gill v. United States, 160 U. S. 426, 16 S. Ct. 322, 40 L. Ed. 480. It is further to be considered in this same connection that the patent has never been adjudicated, and what it is worth—whether anything or the large amount appellant claims—must depend upon an adjudication of validity as well as upon what other manufacturers would be willing to pay for its use.

Inferences to be drawn from the foregoing facts undoubtedly lend support to the appellant's theory of the case. In considering them, though, in their proper relation to the evidence as a whole, it is difficult to believe that appellant did not know what he was doing when he executed the assignment. When he accepted the first award his suggestion had been tried out and approved, and before he executed the assignment a number of calendars had been equipped with the device. Being an experienced calendar man engaged in the meantime in operating a calendar, he could not have failed to observe the savings effected by the use of the device. With this knowledge, and believing, as he said, that the patent was to be taken out in his name and would belong to him, the natural thing for him to do after signing the application would have been to inquire as to its progress. He did not do this at any time, and his failure to do it can be explained upon no other credible ground than that he knew, when he executed the papers, that he was disposing of his rights. Not only did he not make any such inquiry, but almost immediately after executing the assignment he retained a patent lawyer in Washington, and through him applied for a patent on a modification of the same device—a competing device. Here again if, as he claims, he did not know that he had assigned the original patent but thought it belonged to him, the natural thing to do, had he wanted a patent on another device which he thought better, would have been to apply for it through appellant and permit it to bear the expense of the application as it was doing on the first patent. Moreover, he admits that he learned in December of 1923 that he had signed away his rights, and yet not until November of 1926, when this suit was filed, did he ever claim that he had been defrauded or tricked into executing the assignment. In the meantime the appellee had granted a license under this patent to another company in exchange for licenses granted to it by the other company, and while we are not inclined to look upon

this situation as giving rise to estoppel by laches, the appellant's failure to manifest any interest in the matter during this time is none the less corroborative of the view that he understood the full import of his act when he executed the assignment. Other aspects of his conduct lead to the same conclusion—his acceptance of a second award in December of 1923, which he refers to in his evidence as "a little Christmas present," and his refusal to sign the application for a process on the same patent, not because he had been misled into executing the assignment now in controversy, but because he had not been adequately compensated for it. At no time under these varying circumstances, when he naturally would have spoken if he believed what he now asserts, did he ever claim that he was defrauded or that he executed the assignment under a misapprehension of its contents.

The courts have no right or power to set aside a contract that is fairly made because of inadequacy of consideration or improvidence of one of the parties; and there was a consideration for this contract—the awards. These awards may be assumed to be sufficiently inadequate, standing alone, to imply fraud, and yet they cannot be given that effect if appellant voluntarily entered into the agreement knowing what he was doing. He had the right, to be sure, to grant only a shop right. That existed, however, independently of the execution of any papers. The fact that he executed papers indicates an intention to do more. He had the right to do this, to make a full assignment, according to the plant custom, for the consideration of a certainty, the awards, rather than incur the expense and take the chances of obtaining a patent and having it sustained. The trial judge thought from all the circumstances that that is what he did, and in our opinion the preponderance of the evidence is not against that view.

The decree is affirmed.